20 minutes per side. Good morning, Mr. Hooper. Good morning, Your Honors. May it please the Court, we actually had requested additional time. Which we denied, as you recall. I do recall, and I'm hoping it's not necessarily solved. Counsel, I was responsible for an order you received to be prepared to answer some questions at this proceeding. I'm satisfied on the 31,000 issue now, but I'm not satisfied on the rest of it. Okay. That will help you. Speed you up a little bit. Yeah, and thank you very much, Your Honor. And with me is Mr. Levine today, and also Dr. Sabaratham and Mr. Bourseau are in the Court today. May it please the Court. I want to address the question, Your Honor, but before I do so, let me just say this. As far as I can determine, this is the first false claims act in this circuit involving a Medicare cost report. And I don't think that's an accident, because I think this Court is aware of the difference between claims and reports. Usually in false claims cases, there are claims for money which are submitted to the government, and the government pays them. That was the case in United States v. McAfee, a case I'm very familiar with, having litigated that case to this Court a couple of times. And in the Seventh Circuit case that counsel just gave to the Court, Rogin. In both those cases, we were dealing with Medicare claims. We weren't dealing with Medicare cost reports. A Medicare cost report is simply not a claim. As its name implies, it is a report, and it's a very thick report. Here, unlike McAfee, and I'm getting to your question, Your Honor. Here, unlike McAfee and Rogin, the Seventh Circuit case, no claims for payments were ever submitted. Here, unlike McAfee and the Rogin case, the government never paid defendants or anyone else, including the hospital, a single penny, single penny, in response to the three cost reports at issue. Well, they were paid for the years involved, but they were paid on the basis of a prior year. Is that correct? Absolutely correct, Your Honor. I do want to get there, if you'll bear with me just for a moment. In Rogin, just so we can see the distinction, because it gets there, that was a hospital case. But in Rogin, it was hospital claims, what Your Honor just talked about. The claims that are submitted throughout a year, sometimes they're called interim payments. And in that case, there's no wonder the court held the way it did, because it found all of those almost 2,000 claims to be false, and the government paid 17 million, $17 million in direct response to those claims. In this case, neither the defendants or the hospital received one penny, I'm going to say it again, in response to these cost reports. And most importantly, too, this district court also said no one pocketed any money unjustly. They're not saying Mr. Bourseau or Dr. Soperatnam were lining their pockets with interim payments. The court specifically found no unjust enrichment. And notwithstanding all this, the court imposed joint and several liability on both defendants for more than $15 million. Kennedy. Let me ask you this. The reports are still pending before the independent auditor, right? That's correct. When the bankruptcy proceedings are finally terminated, I guess there was another bankruptcy started. Is there one still going? There is one, and Mr. Levine actually can answer this, but he informed me, and I will tell you. There was a 2000 bankruptcy in which claims were filed by Medicare, and from what I understand, there were no distributions ever made to any of the creditors, including the government. So the government never got a penny. Is anybody going to go back and either withdraw those reports and amend them, or has the government ever taken any action on any of the reports? Never have taken any action on any report. Where are they now? In the wastebasket or what? That's a good question. I believe that they are sitting in the fiscal intermediary's offices untouched because of this proceeding, and that gets to the core of the question. May I stay with that for a moment, Your Honor? Your Honor is right on point. But I feel like I still need to tell Your Honors, the 1997, 1998, and 1999 cost reports were submitted, but the payments that were being received by Bayview Hospital during that whole time were based on the 1996 cost report, as Your Honor is aware. That has never been challenged. And as a matter of fact, that cost report was the cost report that was prepared by the bankruptcy trustee the first time Bayview was in bankruptcy. Thus, if a patient was in Bayview Hospital in 1998, for example, and had ten days of services received, psychiatric services, the interim payment that the court or, excuse me, that the fiscal intermediary determined was $695 a day based on the 1996 cost report. So Bayview, when that patient got out, would have submitted a claim for ten days, and that patient, the services would have been paid by Medicare for $6,950. No one is contending those claims are false. In Rogin, those were the claims that the court said were false. And that's a big distinction. So, and most importantly, Your Honor. Why are the reports put on hold pending bankruptcy? Well, I think you have to address the government on that, but let me just say this. I think I can share some insight. First of all, these reports were put on hold for two reasons. The most important reason was the government said no more in the process. Stop the process. We're coming in. So they put them on hold. As an additional and independent reason, under the Medicare manual provisions, what happens is when a provider, a health care provider such as a hospital, is found to be insolvent or suspected to be insolvent, there is a rule that the fiscal intermediary is not supposed to take any action on the cost report. And I think the reason is there is perhaps a pending bankruptcy, and everything should be shipped to the bankruptcy court. So there's no action taken. I do want to point out that in this case, no action was taken primarily because the government unilaterally decided that it wasn't going to process these cost reports. I want to make sure I understand how your, the rule you would have us apply here would play out. Is it your position that if somebody just lies right through their teeth on these cost reports, if there hasn't been an audit, there's no reverse claim here, there's no liability under the false claim? You just flat-out lie. You say you own a hospital. You don't own a hospital. Okay? Just a flat-out whopper. And if the government doesn't catch it at an audit, you know, that's just your lucky day. Is that the way it works? No. And as Your Honor knows, I'm assuming that it's a flat-out lie, which, of course, we dispute heavily. But nevertheless, assuming the flat-out lie scenario, we do believe that probably constitutes a reverse false claim. It doesn't constitute a claim. But under A-7, it constitutes a reverse false claim because you just can't put anything in there. Now, again, I'll – The district judge found that these were whoppers. Well, he – well, we disagree. I know you disagree with his finding, but that's what he – Okay. Let's say they're whoppers. And then, okay, what is the remedy? Well, this gets us to the Sixth Circuit case, MedShares, which the district court bought off on completely, which John Boese, the commentator cited by this court in many cases, says is wrong on damages. And this time, I think I agree 100 percent with John Boese on this. But let me just say this. The basis for MedShare's decision, and when we read it very carefully, was that the court correctly treated it as a reverse false claim under A-7. There were two, by the way, there were two reports in MedShares. One was an interim report which actually caused some payment to be made. That's different. We never had anything like that. The other one was a final cost report which, because of the lies of the provider, showed a lesser amount owing to the government than otherwise would be the case. MedShares, the Sixth Circuit decided to say, well, here's what we're going to do. We look at the False Claims Act, and we think it's intended to cover any kind of fraud. And we're essentially going to presume damages in that situation. Even though the government doesn't pay a penny in that situation, we're going to presume it. Well, the government doesn't pay a penny, but by the same token, it's not getting back the money it's supposed to get back. I'm with you on that, Your Honor. Okay. Now, let's stay with me for a moment. But the rationale for the decision in MedShares is that the court said the False Claims Act is the exclusive vehicle for resolving these kinds of issues. I don't know why, but neither the court nor the attorneys apparently brought to the court's attention a statute right on point which is intended to cover your exact scenario. And that's the Medicare Civil Monetary Penalties Law, which is found at 42 U.S.C. Section 1320A-7. A copy of it is attached to Mr. Bourceau's reply brief. In that case, it contemplates your exact scenario, because it says under that statute, a claim includes an entry in a cost report, a whopper in a cost report. And most importantly, Congress knew when it wrote this statute how to deal with the problem Your Honor has raised. It said we are going to presume damages in that situation. In lieu of actual damages, the statute says, in lieu of actual damages, the government can get treble the amount claimed in the cost report. Our position is, and we've said this from the beginning of the government, your theory is you're bringing it under the wrong statute. And if it is one, if these are whoppers, which are not whoppers in my opinion, do it under the statute that Congress intended. MedShares doesn't even mention it. And instead, the judge says this is the only statute they can go out, and there's no something like that. I mean, it wouldn't be inconceivable there could be multiple remedies. They could charge these guys with mail fraud. They could Absolutely. There can be multiple remedies, but that's not what Congress intended here. I think if you look at the congressional intent of both of the civil monetary penalties statute, and I think the government will confirm this, you can't have it both ways. If you're going to go damages or money penalties under the civil monetary penalty laws, you have to go under that statute. You can't go under that statute and then also seek damages under the False Claims Act. We think Congress said, here's how you do it. And civil monetary penalties was the right way to go. We think there are no damages to the government in that situation. And I know Your Honor knows the difference between liability and damages very well. And let's look at causation, because Your Honor says, wait a second, we gave you money. We should be getting some of that money back if you were telling us the truth. Well, the money that you gave us was not in response to any of these cost reports. The money that you gave us was your best estimate of how much your costs were per day based on the 1990s. That's only half of it. The other half is the money you have to pay back is based on the cost reports. Okay. Now, that gets us, I think, to what is a reverse false claim. Because as I read the cases, and that's a reverse false claim definitely in my opinion. A-7, which in my opinion, wipes out everything else that the district court did. There's no liability under A-1, A-2, A-3. If there's any liability, it's a reverse false claim. And as I read the cases and interpret reverse false claims, there must be an obligation independent of the obligation created by the filing of the false claim. In other words, there must have been some amount owing. Now, we know there is not a determination of an amount owing until the cost reports are filed. The way I read those cases, therefore, that would not qualify as a reverse false claim. Because all this money that had been received previously, they were entitled to under the 1996 cost report. It may be sometime in the future these cost reports would have affected rates, but they were never acted on, as we just discussed with Judge Beezer. One other point in this case. We can't do what if. That's what the government's expert did. He did a what if scenario. The U.S. attorney literally went to him and said, assume that all these costs are out of there. And he said, okay, I'm going to do a what if calculation. And he did one, which he should never have done because he made assumptions that were incorrect. He didn't realize that Bayview was a separate or was not a separate entity. It was a DBA for CPMS. He didn't know they were in bankruptcy. And so he came up with a figure that was based on nothing but speculation and hypotheticals. Let's look at what really happened here. When they submitted the cost report, CPMS was bankrupt, basically. Insolvent. Did not they didn't pay any money back on these cost reports, which is contemplated under the Medicare manual. Under the Medicare manual, it is contemplated you either pay it with a check. And this is only an estimate at this point. This is unaudited cost reports. You either pay with a check or you figure out some kind of repayment schedule. What would have happened if this had been followed through is that, assuming that these are all whoppers, there might have been $5 million more owing to the government in the bankruptcy proceedings. And the government, therefore, should have presented proof. It had the burden of proof in this case, including on damages. Its proof should have been, okay, here's what we would have gotten if this process had played out. It would have been in bankruptcy, and the damages should have been equal to, at worst, at worst, and I don't even concede this, what the government would have gotten through bankruptcy if these claims had not been false. May I just make another point, Your Honor? By the way, this is, I'm not alone on this idea that the cost reports, when they're not audited, are kind of meaningless. The Supreme Court in Guernsey said, of course, the filing of the cost report is the very first step, very first step in the process. The government's own expert agreed with that. In this case, Mr. Potter, who spoke quite honestly, by the way. And also, in the bankruptcy, the government lawyer, excuse me, in the bankruptcy proceeding, the government also took that position. If we're at the unaudited report stage, can the penalty still be imposed? I think that's where we are. If you assume, if one were to assume, Your Honor, that these are false cost reports, whoppers, as Judge Silverman terms them, the most, I think, the government gets in that situation are penalties for the three companies. In this case, $31,000, right? That's the way we've analyzed the case. If I may, just for a moment. Is that a judgment right now? Pardon me? Is that a judgment, the $31,000 plus the other? They're both judgments, right? Yes. So that judgment for the penalty is drawing interest? I assume so. All right. Okay. But in any event, let me just, if I may, I know I'm running out of time. I want to just distinguish two things. I have to talk about Dr. Salveratnam because he's so innocent in this situation. I have no idea why the government went after him, and I have no idea why the district court lumped him in because he knew nothing about cost reporting, had nothing to do with the cost report process. He just happened to have an ownership interest in the partnership that owned the hospital. This is undisputed. No one ever said anything. And two other things, and this is where the Court said they got. He attended two meetings for a portion of time when the 1997 and 1998 cost reports were discussed. And I can only assume that the district court said because he didn't tackle Mr. Bourseau because Mr. Bourseau, when Mr. Bourseau went to sign the cost reports or he didn't tackle Mr. Feilat when Mr. Feilat went to file the cost reports, he's reliable. We know of no definition, no reasonable definition, of cause to be submitted that would make Dr. Salveratnam responsible under certain terms. And any meetings in 1999. Correct. Do we have anything in 1999 that connects him to these people? Nothing connects him. Yet the Court, when it holds generally liable Dr. Salveratnam and Mr. Bourseau and never discusses with respect to excessive fines, by the way, the relative liability or relative misconduct or what have you, we don't think you ever have to get to the excessive penalty. I want to get to Rogin on that. The Seventh Circuit for some reason in Rogin said it's uncertain whether the Eighth Amendment even applies to the False Claims Act. That's not accurate in the Ninth Circuit. United States v. McAfee says specifically it applies. And the district court realized it. It just didn't apply it correctly in this case. It didn't begin to make the analysis. One more thing. I gave Your Honors a decision today from the district court in District of Columbia. It's a complex Medicare cost report decision. I get it for this reason. The evidence in this case is Mr. Bourseau was told by his Medicare expert, if you put these costs in the cost reports, they're going to get audited out. The judge for some reason thought that means you therefore knew you were putting whoppers in there. That's not consistent with how the Medicare program works. And Your Honors know that if you've had some of these cases. But this is a recent one. In 2008, in this very same decision, the district court judge says or excuse me, the Secretary takes the position in that case that hospital, if you don't put costs in your cost report, you can't ever appeal those. And that's exactly what Mr. Bourseau testified to. I put them in the cost report because I wanted to appeal them. He even said to the Ninth Circuit, if necessary. And Mr. Feilach, the expert, disclosed it. Now, he didn't protest it the way the government says you're supposed to, but here's a subtle little distinction the government's ignoring, that you only have to protest items if you're challenging a regulation or a policy of Medicare. That's not what was happening here. Mr. Bourseau took the position that if the fiscal intermediary correctly applied these complex rules, they would have been allowed these costs. And I can go in in boring detail on these, why these are not whoppers, but I'm not going to do that. I think we did that in the brief. So whatever remaining time I have, I would like to reserve. Thank you very much. Thank you, Mr. Hooper. Good morning, Your Honors. I'm Rob McAuliffe. I'm here on behalf of the United States. We believe this district court decision should be affirmed. The facts are essentially not in dispute. The defendants in this case have essentially raised a legal challenge to the district court's opinion as opposed to a factual challenge. Well, where's the claim filed? The claim in this case are the cost reports. Where are those filed? No, where's the claim under false claims? There's no claim under false claim. There's a report filed with an intermediary who's going to audit the thing, and they haven't audited. And the government has paid money not on that basis of the three filed reports. They've paid money on a basis of a prior one that's not at issue in this case. First of all, with regard to reverse false claim, A-7, there's no requirement there be a false claim. A-7 imposes liability if there's a false record or a false statement made to reduce an obligation to the government. But, you see, the government has assumed no obligation whatsoever based on these reports. They're sitting on a shelf someplace or in a trash can. The reports were submitted to the fiscal intermediary. And the record of this case is when there is an allegation of fraud made to the fiscal intermediary, in those cases, types of cases, the fiscal intermediary does not complete an audit. They refer that for a fraud investigation. And that will go either to Program Integrity within the fiscal intermediary or to the Office of Inspector General within HHS. The intermediary never got that far in this case, did he? Yes, it did. Of these three reports? Yes, it did. In July of 1999, the COO of the hospital, David Klingo, sent a letter to Mutual of Omaha in which he said that the owners of this hospital had a clear intent to commit fraud. When a fiscal intermediary receives an allegation of fraud like that, we move off the audit track. We move on to the fraud investigation track. That's exactly what happened in MedShares as well. There was an allegation of fraud in MedShares. The fiscal intermediary did not complete the audit on the cost report that counsel has referred to in the MedShares case. It never started the audit, did it? In MedShares, they may have started it, but they clearly didn't finish it. In this case. In this case, they did. They started the audit. There was some document. All three years? Certainly for 97 and 98, there were some requests made by the fiscal intermediary to the hospital to provide information as part of the fiscal intermediary's audit. That's in the record. But the key fact is that in July of 1999, while these cost reports were being still being audited, the fiscal intermediary received this fraud allegation from Mr. Klingo. And what happened as a matter of fact is that that put the case, put this investigation onto the track of a fraud investigation, which has led to the case. So where those cost reports are to this day with regard to these claims are in this court. Where do we find that in the record? It's in the record because the United States chose to pursue these particular costs that we're all talking about through bringing a false claims act case in the district court in San Diego. That's where the United States chose to pursue and recover for the false costs that were included in the cost reports. Who signed the cost reports? The cost reports were signed by Mr. Borceau. Tell me exactly what Dr. Sabaratnam did. Dr. Sabaratnam, Mr. Borceau, and Dr. Sabaratnam are the only two owners of this hospital at the time. They had corporations, but the district court found those were single employee corporations, meaning there was only Mr. Borceau and only Dr. Sabaratnam. They ran Bayview together. Dr. Sabaratnam has been a CEO of another hospital. Dr. Sabaratnam had signed a cost report for another hospital. What does that have to do with this case? It has to do with this case because Dr. Sabaratnam is familiar with cost reports, the requirements of the world's report. He's the world's greatest expert on cost reports, but I don't know what he did here. What he did here is he attended meetings, multiple meetings, two meetings in particular, one in 1998 and one in 1999, during which the discussion was we now realize we owe Medicare-backed money for the prior year, for 97 and for 98. Meeting with the cost report consultant, with Mr. Borceau and Dr. Sabaratnam, they decided they needed to talk about ways they could reduce how much they owe. That was for year 97. That was for the 1997 cost report. The meeting took place in May of 1998. And for the 1998 cost report, the meeting took place in May of 1999. And he was present at that meeting. He was present at both meetings. And for the 99 report? For the 99 report, there was no meeting. I think that question had already been asked. What he was found with regard to the 99 cost report by the district court was that he had agreed with Mr. Borceau in terms of including the cost that were included in the 1999 cost report. What testimony supported that? Mr. Borceau's own testimony. He said that he said what? Mr. Borceau testified that, for example, for the interest that was claimed on the cost report, for the bankruptcy fees that was claimed on the cost report, and there were bankruptcy fees on the 99 cost report. There was financing fees that were to NCA fee that was on the 99 cost report. Mr. Borceau testified that his partner agreed with him to include those costs. So the factual support for Dr. Sabaratnam being involved in the 99 cost report comes from his own partner, Mr. Borceau, who testified that his partner agreed with him. During these meetings, to come back for a second, during the meetings that we do have in the record in 1998 and 1999, the cost report consultant they had, Mr. Fayolat, advised them that including the full amount of the interest and the bankruptcy fees would be improper. That's what the court has found. He advised them that his professional judgment was that they would not be allowed. Dr. Sabaratnam attended both these meetings. Dr. Sabaratnam testified that Mr. Fayolat is the expert in these matters. Mr. Fayolat should be followed. But what did they do? They ignored Mr. Fayolat, and they submitted these false costs in the cost reports. The district court found with regard to some of the costs that Dr. Sabaratnam not only agreed but also directed some of those costs, and some of those particular costs are included in the district court's opinion. But the big picture is he attended these meetings, he was advised by Mr. Fayolat with regard to the interest and bankruptcy fees that it would not be appropriate to do it that way. With regard to the other items, the rent, the rent was completely fictitious, completely false. Dr. Sabaratnam attended that very meeting in May of 1999 when that rent was discussed, and it was decided to include that rent on the cost report. This is the space that was just partially used you're talking about? Two separate issues, Your Honor. There was a rent expense for approximately $400,000 that was put on the 1998 cost report. Mr. Borceau conceded a trial. That rent never existed. It was a complete fictitious rent. It was included onto the 1998 cost report in order to reduce what the hospital owed back to Medicare. Complete fictitious. The space is a separate claim, claim. The space is a separate item that was put onto the cost report. The space was approximately 16,000 square feet that was added into the cost report. Now, that may not mean much to the Court, but 16,000 square feet was roughly one-third the size of that hospital. This was an enormous addition that they put onto the cost report for the 98 and the 99 years. And some portion of it was used. Some portion of it was used for storing furniture. Some portion of it was used for meetings every now and then. The testimony in the case from the individual whose name was Judy Brennan, who ran the program, which is called the Partial Hospitalization Program, she testified that that space had been closed years earlier. So, yes, they used it to store old furniture. Yes, in some rooms, and they used it for some meetings. But it's not used for patient care. And that was the fundamental point that the district court found on the space. And I believe this Court found that Dr. Saab Rotem acted in reckless disregard with regard to the space and reckless disregard with regard to the management fees. And those were, I'm sorry, not the management fees, to the lease, to the rent. In a normal, when a normal cost report is processed, I take it the intermediary certifies to the government the dollar amount that should be paid. Is that correct? The normal process is they reach an NPR, Notice of Program Reimbursement, and that comes from the fiscal intermediary, and it notifies the provider, the hospital, here's how much either, here's how much we're going to pay you in addition, or here's how much you owe back. That's in the context of a completed order. And a copy of that is sent to the government, who's actually the payer, right? Well, the fiscal intermediary draws down funds from the Medicare trust fund. Okay. And that's a fairly complicated process. But, yes, the payer is the government. That process was never pursued in any of these three claims, right? That process was not pursued because of fraud allegations. Okay. Right. And one of the reasons why, and by the way, if I could address the damages question that we spent some time with, MedShares, we believe, is squarely on point here. MedShares was exactly the same setup, where there was a cost report, a false expense on the cost report, there had been no NPR, no final audit. You know, I read the case, and there's a lot of material in there that's judgmental. Like, you know, we do good things and that. There's nothing in our record that supports some of the statements that are made in that opinion. Do you agree? Well, with regard to this question. Yeah, a lot of human nature stuff and why people do things. It sort of lacks a statutory base. Well, with regard to this issue. It's squarely found that by including that pension expense on that cost report, that entity, that provider, not a hospital, it wasn't a hospital, that provider reduced what it owed back to Medicare and thereby damaged Medicare. And I think those facts are undisputed. That is, that there's a certain amount of pension expense put on that cost report, undisputed. The money had never been paid back. Undisputed. There was no audit in that case. And part of the rationale for MedShare's reaching that decision was, in part, that the idea of an audit is an administrative mechanism to make adjustments. It's not a remedial mechanism for fraud, in that if you do have an allegation of fraud, if you do have a fraudulent cost report, an audit is not the right process to figure out fraud. And as a factual matter, that's what happens in these fiscal intermediaries. If they find an allegation of fraud, they refer it to OIG or other entities like the Department of Justice to pursue a fraud case, which is what we did here. Kennedy. Is the intermediary an employment of the government? Does the intermediary get all its compensation from the government? Not all of it. With regard to an intermediary is an insurance company. In this case, it was Mutual of Omaha. With regard to administering Medicare, yes, it gets paid. It's under contract with the government. So it gets paid. Now, it does private party things, too, but that's a separate matter. So they're the government's advocate in the review of the reports, right? Well, they're the government's agents in reviewing the reports. That's what they're, by contract, they do. One of the things that I think is also important to point out with regard to these audits, it was recognized in a case called Calhoun, which is an 11th Circuit case, which we cite in our briefs. And that was a cost report fraud case as well as a criminal case. But in that case, I think it was in the late 90s, it recognized that there are many, many hospitals in this country, and the government and these agents, these fiscal intermediaries, do not have the resources to audit every single hospital. They do what, more often, they do what's called a desk review, which is basically comparing numbers on a page. They're not going out and interviewing people at the hospital. If this audit had gone forward, they would not have interviewed Mr. Fayolat to find out, did Mr. Fayolat tell Mr. Bourceau and Dr. Saborotan it was improper to put these costs in there. They would not have gone out and interviewed Mr. Morris, the CFO of the hospital, to find out what did Mr. Morris tell Mr. Bourceau when he decided to put that fake rent in there. They don't do those kinds of things in an audit. An audit is not designed to ferret out fraud. So part of the rationale for not requiring an audit to be completed in order for a false claims act case to be brought is that one. In addition, in this, you will see in the MedShare's case, as well as other cases, such as a Leahy Clinic case, which we've also cited, which is out of the First Circuit. Leahy Clinic is a Medicare Part D case, but the argument there was made that the government has to go through its administrative mechanisms before it can try to recover overpayments. And the Leahy Clinic decision in the First Circuit says, no, it doesn't. And part of the rationale is because Congress, in enacting the False Claims Act, gave the United States an ultimate right of ----  The government had settled the hospital based on the prior report that was not at issue here, right? The 1996 cost report is not at issue here. And that's how payments were settled for the following three years or four years? That's how interim payments were made, which are the estimated payments that are made throughout each year based upon the ---- We're going to get around to an audit. Pardon me? Are we ever going to get around to an audit in those cases? We ---- the United States chose to bring these costs through the district court False Claims Act case. Is this a better deal for the government than a true audit? Well, that's an interesting point, because counsel talked about the what if. It's the same deal. It's the same deal, except for the False Claims Act, which applies when you have evidence of false claims and knowingly submitted false claims, trebles under the False Claims Act. But with regard to the single damages, it is not a better deal. It's the same deal. Why do I say that? Because as counsel was talking about this what if process, this what if process that he's talking about, the testimony in the case was the damages were based upon removing the false costs from the cost reports and rerunning through a software program that's used by the auditors, rerunning the cost report through that software program to figure out what is the impact on Medicare reimbursement if we remove these costs. That is exactly what was done in this case.  So if the audit had gone forward and been completed on these costs that we're claiming, the result would be the exact same. Let me ask you a question about false claims in general. Suppose you're a lawyer for the government in Washington and you fly out to Pasadena to argue a case. When you get back, you turn in a travel voucher that says my airfare was $5,000, just a ridiculously high improper claim. The person looking at it in the office when you get back says this is bogus, I'm not paying it. Could the government bring a false claims act against the person who submitted that claim if the claim hadn't been paid, if they catch the fraud before they pay it? They probably could, but you may not have damages. That's the issue. Right. That's where it's distinguishable from this case. Okay. Well, in this case, let's assume they send in this cost report that's full of a bunch of bogus stuff, but they never actually bring it to fruition by completing the audit. Isn't that kind of like catching it? I mean, they haven't reduced it to one of these, what is it, notice of program reimbursements? They caught the fraud before they lost any money. That's what I think they're arguing. Why isn't that right? That doesn't apply here because the government has lost money, because the interim payments that were made through the year, which are in the pocket of the hospital, which have in fact been paid to the hospital, is still in their pocket. What's the proof of that? They've never paid it back. That was stipulated to them. Well, the money is still in their pocket. I mean, there's no dispute about that, but they haven't gone through the reconciliation process to know what is to be paid back. That, when the hammer drops, is when they issue the notice of program reimbursement. Well, the way it works, and the PRM goes directly to this, is when you file your cost report and you're supposed to report your true costs, and when you report your true costs and you report that you owe money back, you write a check and you pay it back right there. So the obligation exists at the time you file the cost report to pay back what you owe. If you don't pay it back, first of all, if you don't report it correctly, then it doesn't show that you owe a million dollars. So they're supposed to pay it with the report. They're supposed to cut a check for whatever their difference is at that time. They don't wait for the notice of program reimbursement. Well, that's what the PRM requires, the program reimbursement manual. They're not overpaid. They're paid on the prior report from three years ago. The reason they're overpaid is because the amount of reimbursement they got for each of those years is supposed to be based upon their actual costs. We don't know that. And their actual costs as reflected they didn't reflect their actual costs in the cost report. If they had, it would have shown that their actual costs were lower than the amounts they got paid through the years in those interim payments. Who added to that until the stat in the testimony? I'm sorry. I didn't catch that. It was set up here in the record. That's the testimony of Mr. Potter, who testified that if you run the normal program to, if you remove the rent, let's take one example, the rent expense, completely fictitious, $400,000. If you remove that from the cost report, they re-ran that through the software, and the impact that had on Medicare reimbursement was they owed an additional X dollars back. I don't have the exact figure. That's part of the record in this case. So when you, so the reason that they. Were they ever paid any money because they had that space in use? Well, no. On those cost reports, when they included that space, it reduced what they owed back. And the reason that the government is damaged is because they had that money. They were paid that money through the course of the year. So there is Medicare loss there. I notice I'm running out of time. If I could quickly, unless the panel has more questions about damages, I'm happy to go to another subject. We've got about a minute left. I'd just like to address the obligation point. The Conagra case, I think, which is out of the Tenth Circuit, addresses this. What counsel is saying is if you have a situation where there has to be follow-up steps taken and there's discretion on the part of the government, then it's not a reverse false claim because there's no obligation. The classic example of that is a motorist speeding through a national park. He gets pulled over. The cop stands there and the motorist says, I wasn't speeding. If the cop says, slow down and go on your way, there's no obligation there by the motorist to pay that money back. That's the context of these cases that counsel is talking about. That is, the cop could decide to give a ticket and could decide to not give a ticket. In this case, we don't have that. What we have is a hospital which had the money in its pocket, had government property in its pocket, the money, and when they made these false claims, the fiscal intermediary doesn't have the discretion. If the fiscal intermediary, if in fact the rent doesn't exist and it's fictitious, the fiscal intermediary can't be like the policeman and say, have a nice day, go on your way, keep your money, because the Medicare Act and regulation does not pay for fictitious expenses. So there is no discretion. Kennedy. Does the government bring a fraud claim against every report that is altered in audit in favor of the government? Absolutely not. Absolutely not. The government brings false claims on cases when there's evidence of the knowing submission of a false claim. Since there's been no audit here, how do we know the numbers are even, that you're using are even correct? Because the record establishes that the numbers were the numbers that were determined based upon the exact same process that would have been done in the audit. So if this you proved that at trial, in other words, is the answer to Judge Beeser's question. That was Mr. Potter's testimony at trial. Yes, Your Honor. Thank you. Thank you. Let me rush up here, Your Honor, on Judge Beeser's last point. If they had stopped the audits in Vista Hill, if they had stopped the audit in any of these nine-circuit cases I cited, those – every one of those claims could have been determined to be false. Government could have sought – if they stopped the audits, they could have sought false claims in every one of those. In every one of those cases, the Ninth Circuit overturned the intermediary. We never had that chance here. I have no trouble with Mr. Potter's testimony. He was very honest. Please read it. I am sure you have. I have no problem with it. What we never got because they stopped it was we had no chance to appeal these to the expert body who would have found that we were right on some, if not all of them. We also never – the government got a complete windfall because it didn't have to get its money out of bankruptcy. It could try to get its money outside of bankruptcy. It was able to circumvent bankruptcy. The rent was a mistake. There was no intention. It was disclosed as a related party transaction. It would have had no impact on reimbursement. How could it have gotten its money outside of the bankruptcy? It got – it's trying to get it directly through these individuals. It's – if things would have played out here without the government doing this If they ordered it. Well, if they – I think under the Ninth Circuit rule, what's supposed to be – the rule of damages is what would the damages be if the claims had been true. If the claims had been true, the amount in bankruptcy would have been maybe $5 million more. We dispute it, but that might have been. And they would have had to get their money out of bankruptcy. By causing this a false claim, they aren't left with the remedy in bankruptcy. Now they're going individually after these two gentlemen for $15 million. They never got anything. They were never unjustly enriched, but they're executing on their property today, today, for $15 million. Who's in bankruptcy? Pardon me? Who's in bankruptcy? I'm – Who is it? CPMS, the corporate entity. Is that bankruptcy still going? Mr. Lien? The trustee actually just filed the notice of final report in the last week or two. So the case is in the process of being wrapped up. So they could demand their claim in bankruptcy at this point? They could. The government? The case isn't closed yet. One more very final point. That's against the corporation. That's not against the two – That's who the money was owed by. But real quickly, Your Honor, one final point. Mr. Bourceau does not say, Mr. Dr. Sava Rockham agreed. It's more, he said he didn't disagree. Yeah, he sat there. He doesn't hear very well, first of all. Secondly, he's a doctor. He doesn't know anything about cost reports. So he sits there. He doesn't say a word. Next thing you know, he's hit with a $15 million judgment. We think that's harsh. Thank you, Your Honor. Mr. Hooper, thank you. Mr. McCall, thank you as well. This committee will stand in recess for the day.
judges: Beezer, Hall, Silverman